UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

SPENCER KEOLEIAN,

                Plaintiff,                          Case No. 1:25-cv-10090

v.                                      Honorable Thomas L. Ludington
                                            United States District Judge

AMIEN A.S. CARTER and the MARGARET
RINTOUL IV, a 49.6' sailing yacht, Hull No. 929740,

                Defendants.

_____/

**OPINION AND ORDER GRANTING DEFENDANT'S MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION; GRANTING DEFENDANT'S MOTION TO AMEND IN PART AND DENYING IN PART; AND ISSUING SCHEDULING ORDER**

Plaintiff Spenser Keoleian is a former deckhand of the yacht Margeret Rintoul IV (the "Rintoul"). The Rintoul is captained by Defendant Amien A.S. Carter. The facts of this case focus on a series of events that follow the Rintoul's participation in a yacht race from July 20, 2024 to July 23, 2024, which the Rintoul completed on Monday, July 22, 2024. Plaintiff alleges that after the race, Defendant Carter directed a prostitute to assault him in the morning hours on July 23, 2024.

On September 12, 2025, Defendants filed a Motion to Dismiss the *in rem* jurisdiction maritime claim against the Rintoul. Defendant argues that Plaintiff's facts do not establish a justification for the exercise of maritime jurisdiction because the incident did not impact maritime commerce nor involve a maritime tort. Additionally, on August 29, 2025, Defendants filed a Motion to Amend pleadings, seeking to amend admissions and denials, assert affirmative defenses not yet advanced, and file a notice of non-party at fault.

Defendants are correct, Plaintiff has not stated facts which establish maritime jurisdiction, so Defendant's Motion to Dismiss will be granted. But Defendant's Motion to Amend their pleadings will be denied, as will their notice of "Non-Party at Fault." However, the motion to amend will be granted as to certain "new" affirmative defenses.

**I.**

**A.**

Plaintiff Keoleian was a deckhand on the Rintoul during the July 20, 2024, 100th Bayview Mackinac Yacht Race in Port Huron, MI. ECF No. 10 at PageID.38. The Rintoul finished the race on Monday, July 22, 2024[1] and was docked somewhere in the Mackinac Island Harbor. *Id.* Then, Plaintiff and a fellow crew member spent the afternoon biking, returning at 11:00 PM that evening. *Id.* at PageID.38–39. Upon their return, they found Defendant Carter, the skipper, on the main deck of the yacht, allegedly intoxicated from alcohol and/or prescription narcotics. *Id.* at PageID.39. Plaintiff and two other crew members went to bed below deck. *Id.*

At approximately 1:00 a.m. the next morning, Plaintiff was awoken by an individual— allegedly a transsexual prostitute—performing fellatio on him. *Id.* Plaintiff allegedly pushed the prostitute off of him, saw her walk over to Defendant Carter, who then told her: "[m]y crew's had a long race, why don't you take care of them and blow them." *Id.* The prostitute then approached the crewmember above Plaintiff's bunk, who also pushed her away. *Id.* Allegedly, the prostitute attempted to approach Plaintiff again in the lower bunk, but Plaintiff resisted again. *Id.* Defendant

---

[1] In the Amended Complaint, Plaintiff states that the Margaret Rintoul IV finished the race on "Monday, July 23, 2024 at 9:51AM." ECF No. 10 at PageID.38. But this Court takes judicial notice that July 23, 2024, was a Tuesday, not a Monday. And the race tracker for the 100th Bayview Mackinac Yacht Race reflects that the Margaret Rintoul IV completed the race on "Monday - 09:51:48." *2024 Bayview Mackinac Race Overall Finishes - All Divisions*, BYCMACK, https://bycmack.com/past-results-2024-overall/. This Court concludes that the Rintoul finished the race on Monday, July 22, 2024.

Carter allegedly responded to Plaintiff, "don't be a c*nt!" *Id.* Then, Plaintiff and another crewmate gathered their sleeping bags and returned to the main deck. *Id.*

**B.**

On January 10, 2025, Plaintiff filed his Complaint with this Court alleging six claims. *See* ECF No. 1. The first Amended Complaint was filed on March 7, 2025. ECF No.10. The Amended Complaint identified the following claims:

| Count | Claim | Defendant(s) |
|---|---|---|
| I | Negligence (state law) | Defendant Carter |
| II | Gross Negligence (state law) | Defendant Carter |
| III | Battery (state law) | Defendant Carter |
| IV | Assault (state law) | Defendant Carter |
| V | Intentional Infliction of Emotional Distress | Defendant Carter |
| VI | Maritime Tort Lien (Federal In Rem Jurisdiction) | The Rintoul |

*Id.* at PageID.40–6.

Between late August 2025–September 2025, the Parties filed several motions. First, on August 29, 2025, Defendants filed a Motion to Amend. ECF No. 24. They seek to (1) amend their admissions and denials, (2) assert new affirmative defenses, and (3) file a notice of Non-Party at Fault. *See generally* ECF No. 24. Then, on September 12, 2025, Defendant Carter filed a Motion to Dismiss for a lack of subject matter jurisdiction. ECF No. 27. He contends that Plaintiff has not stated facts sufficient to assert maritime jurisdiction; thus, arguing that Plaintiff could not establish *in rem* jurisdiction over the Rintoul.[2] *See generally* ECF No. 27. And finally, on September 22,

---

[2] Notably, the Court still retains diversity jurisdiction over all other claims because Plaintiff is a citizen of New York and Defendant Carter is a citizen of Michigan and the amount in controversy is expected to exceed $75,000. *See* ECF No. 10 at PageID.38. Notably, Plaintiff states in his Amended Complaint that jurisdiction exists "solely under diversity of citizenship." *Id.* But an *in rem* suit against a vessel is "distinctively an admiralty proceeding, and is hence within the

2025, Plaintiff filed a Motion to Compel seeking discovery from Defendant Carter, ECF No. 29, which was granted on January 9, 2026. ECF No. 36.

## II.

### A.

A court's subject matter jurisdiction is a "threshold determination" that may be challenged under Rule 12(b)(1). *Am. Telecom Co. v. Republic of Lebanon*, 501 F.3d 534, 537 (6th Cir.2007). "Where subject matter jurisdiction is challenged pursuant to Rule 12(b)(1), the plaintiff has the burden of proving jurisdiction in order to survive the motion." *Moir v. Greater Cleveland Reg'l Transit Auth.*, 895 F.2d 266, 269 (6th Cir. 1990). A Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction may involve a facial attack or a factual attack. *Golden v. Gorno Bros., Inc.*, 410 F.3d 879, 881 (6th Cir.2005). "A facial attack goes to the question of whether the plaintiff has alleged a basis for subject matter jurisdiction." *Cartwright v. Garner*, 751 F.3d 752, 759 (6th Cir. 2014). Accordingly, when considering a facial attack, the court treats the facts alleged in the complaint as true. *L.C. v. United States*, 83 F.4th 534, 542 (6th Cir. 2023).

Here, Defendants' Motion makes a facial attack: challenging facially whether the facts Plaintiff relies on to establish federal maritime jurisdiction actually do so. *See* ECF No. 27 at PageID.192.

---

exclusive province of the federal courts." *Am. Dredging Co. v. Miller*, 510 U.S. 443, 446–47 (1994) (citing *The Moses Taylor*, 4 Wall. 411, 431 (1867)).

**B.**

First, a history of admiralty jurisdiction is instructive. Federal district courts have original jurisdiction over "[a]ny civil case of admiralty[3] or maritime jurisdiction." 28 U.S.C. § 1333(1); *see also* U.S. Const. art. III, § 2. Historically, the question of maritime jurisdiction turned solely on the question of whether a tort occurred on navigable waters. *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 531 (1995). But this rule, though simple, was untenable because an injury had to be "wholly" sustained on navigable waters for a tort to justify the exercise of maritime jurisdiction. *Id.* at 532 (citing *The Plymouth*, 3 Wall. 20, 34 (1866)). The Supreme Court in *Grubart* gave an example to illustrate maritime law at that time: "[A]dmiralty courts lacked jurisdiction over, say, a claim following a ship's collision with a pier insofar as it injured the pier, for admiralty law treated the pier as an extension of the land." *Id.*

But Congress expanded this location-based rule in 1948 by enacting the Extension of Admiralty Jurisdiction Act, which extended maritime jurisdiction to all "cases of injury or damage, to person or property, caused by a vessel on navigable waters, even though the injury or damage is done or consummated on land." 46 U.S.C. § 30101(a); *see also Grubart*, 513 U.S. at 532. And in 1972, the Supreme Court limited the location-based rule in *Executive Jet Aviation, Inc. v. City of Cleveland*, 409 U.S. 249 (1972). In *Executive Jet*, the case involved a plane which crashed into navigable waters after a collision with birds, *Id.* at 250. The Supreme Court concluded that "the mere fact that the alleged wrong 'occurs' or is 'located' on or over navigable waters" was not sufficient to treat an airplane negligence case as a maritime tort. *Id.* at 268. Instead, the Court held

---

[3] The relevant caselaw uses the terms "admiralty" and "maritime" interchangeably. *E.g.*, *Gruver v. Lesman Fisheries Inc.*, 489 F.3d 978, n.5 (9th Cir. 2007).

that it was "far more consistent with the history and purpose of admiralty to require also that the wrong bear a significant relationship to traditional maritime activity." *Id.*

But what did it mean for something to have had a "significant relationship to traditional maritime activity?" In part, it involved the "navigation and commerce on navigable waters." *Id.* at 272. Or at least this was the case in an aviation context. *Id.* at 272–74. But in 1982, the Supreme Court decided *Foremost Insurance Co. v. Richardson*, 457 U.S. 668 (1982), stating affirmatively that the "*Executive Jet* requirement that the wrong have a significant connection with traditional maritime activity is not limited to the aviation context." *Id.* at 674.

The Court revisited the scope of maritime jurisdiction in *Sisson v. Ruby*, 497 U.S. 358 (1990). In that case, a 56-foot pleasure yacht, docked in a marina on Lake Michigan, caught fire and damaged several neighboring vessels. *Id.* at 360. In determining whether Maritime jurisdiction existed, the Supreme Court applied a two-part test. First, the Court sought to determine if an incident—assessed by its "general features" and not by its "*actual* effects" — had the "potential" to disrupt commercial maritime activity. *Id.* at 363 (emphasis in original). The Court then outlined the second portion of the test: there must be a "substantial relationship between the activity giving rise to the incident and traditional maritime activity." *Id.* at 364. The Court clarified that "relevant 'activity' is defined *not* by the particular circumstances of the incident, but *by the general conduct* from which the incident arose. *Id.* (emphasis added). The Court cautioned that, were courts required to focus on the causes of the harm, they would be forced to decide the merits of any causation issues to answer the "antecedent jurisdictional question." *Id.* at 365.

This two-part test was hammered down into case law in 1995 in *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527 (1995). In *Grubart*, the Supreme Court summarized

the law from *Executive Jet, Foremost Insurance, and Sisson*, *id.* at 532–34, and clearly outlined

the three requirements necessary for a Plaintiff to establish maritime jurisdiction.

Up front, the Court explained that a party seeking to invoke federal maritime jurisdiction

over a tort claim must satisfy both a *location* and *connection* test. *Id.* at 534 (emphasis added). To

begin, "[a] court applying the location test must determine whether the tort occurred on navigable

water or whether injury suffered on land was caused by a vessel on navigable water." *Id.*

Next, a Court must determine whether the Plaintiff has satisfied the connections test. The

connections test raises two issues. *Id.*  First, a court must "assess the *general features* of the type

of incident involved" to determine whether the incident has "a potentially disruptive impact on

maritime commerce." *Id.* (emphasis added). Second, a court must determine whether "the *general*

*character*" of the "activity giving rise to the incident" demonstrates a "substantial relationship to

traditional maritime activity." *Id.*

Only if the location test and both parts of the connection test outlined in *Grubart* are met

will maritime jurisdiction be proper under 28 U.S.C. § 1333(1). *Tandon v. Captain's Cove Marina*

*of Bridgeport, Inc.*, 752 F.3d 239, 248 (2d Cir. 2014). Now, the facts of this case.

### 1. Location Test

To begin, both Parties agree that the location test is satisfied because the alleged events of

the case take place upon the Great Lakes—which constitute navigable waters—and on a vessel

within those waters. ECF No. 27 at PageID.196–97; ECF No. 30 at PageID.249; *see also Sisson*,

497 U.S. at 360; *Grubart*, 513 U.S. at 534.

**2. Connections Test**

Onto the connections test. The first part of the connections test requires courts to assess whether an incident has "a potentially disruptive effect on maritime commerce." *Grubart*, 513 U.S. at 534. *Grubart* says that courts must "assess the general features of the type of incident involved." *Id.* Thus, the Court begins by describing the incident "at an intermediate level of possible generality." *Id.* at 538. The description should be general enough to capture "the possible effects of similar incidents on maritime commerce, but specific enough to exclude irrelevant cases." *Tandon*, 752 F.3d at 249. After characterizing the incident at this intermediate level of generality, this Court must then ask "whether the incident could be seen within a class of incidents that posed more than a fanciful risk to commercial shipping." *Grubart*, 513 U.S. at 538.

Both Parties have advanced what they believe to be a fair characterization of the incident at an intermediate level of generality. To start, Defendants argue that the incident can best be characterized as "alleged drunken mischief directed at a recreational sailor by a fellow sailor and non-sailor prostitute invited onboard, occurring below decks, on a recreational yacht, docked with hundreds of other recreational yachts, in a public marina." ECF No. 35 at PageID.319. Defendant's description, however, is far too specific to be considered an "intermediate" level of generality as required by *Grubart*. 513 U.S. at 534.

Plaintiff supplies their own characterization of the incident: "a captain's sexual assault of a member of his own crew aboard a vessel on navigable waters." ECF No. 30 at PageID.249. But, while this characterization satisfies the intermediate level of generality criteria, it misses the mark in terms of what actually happened aboard the Rintoul in the morning hours of July 23, 2024. This characterization misses the important facts that the incident (1) occurred aboard a sailing yacht,

- 8 -

(2) while that yacht was docked, and (3) that a third party committed the alleged assault. *See* ECF No. 10 at PageID.39.

Therefore, a better characterization of the incident is a sexual assault of a crewmember, by a non-crewmember, aboard a docked sailing yacht.  This description captures both the location of the incident and the roles of the people involved, both of which are important to determining the potential effects on maritime commerce. *Tandon*, 752 F.3d at 249 (citing *Sisson*, 497 U.S. at 363 and *Vasquez v. GMD Shipyard Corp.*, 582 F.3d 293, 300 (2d Cir.2009). When correctly characterized, it is clear that the incident aboard the Rintoul poses no more than a "fanciful risk" to commercial shipping. *Grubart*, 513 U.S. at 538.

Plaintiff argues that the sexual assault of crew members—especially if the captain is involved—can disrupt maritime commerce by dissuading a crewmember from continuing the voyage (or in this case a regatta); thus, disrupting maritime commerce by reducing the number of vessel entrants in future races. ECF No. 30 at PageID.250. To illustrate this point, Plaintiff cites *Doe v. Celebrity Cruises, Inc.*, 394 F.3d 891 (11th Cir. 2004). In *Doe*, the plaintiff was a female passenger aboard a commercial, round-trip cruise ship *en route* from New York to Bermuda. *Id.* at 897. While docked in Bermuda, the plaintiff went out clubbing with one of the crewmembers— her assigned waiter for the trip—and her friends. *Id.* After the club closed, the crewmember, while walking with the plaintiff on the way back to the cruise ship, pushed her to the ground and sexually assaulted her. *Id.* at 898. Here, the Eleventh Circuit held that "[a]s the cruise line industry is maritime commerce, a crew member's sexual assault on a passenger obviously 'has a potentially disruptive impact on maritime commerce.'" *Id.* at 900. The Eleventh Circuit concluded that it was easy to imagine "that if rape or other forms of sexual battery became a concern of passengers,

cruise-ship business would necessarily suffer." *Id.* But these facts are also readily distinguishable from the incident that occurred aboard the Rintoul.

For starters, the sexual assault in this case is alleged to have occurred aboard a yacht after a boat race, not aboard a cruise ship, which—as the Eleventh Circuit explained—is in *itself* an industry of maritime commerce. *Id.* And, while it is plausible to entertain the assertion that sexual assaults can become a concern of cruise lines, there is no evidence that the same effect would happen within the boat racing community, especially if the concern was tied to one particular sailing yacht and one captain. Therefore, it is not conceivable that a sexual assault aboard the Rintoul—a sailing yacht having just concluded a race—could have an effect on maritime commerce in the same way that such an assault would affect a commercial cruise line.

Next, Plaintiff argues that an assault on a crewmember could impair the victim's ability to perform their duties, erode trust in the command structure, or necessitate medical or legal intervention that halts a vessel's activities. ECF No. 30 at PageID.251. To illustrate this point, Plaintiff cites three cases: (1) *Gruver v. Lesman Fisheries Inc.*, 489 F.3d 978 (9th Cir. 2007); (2) *Russo v. APL Marine Servs., Ltd.*, No. 2:14-CV-03184-ODW, 2014 WL 3506009 (C.D. Cal. July 14, 2014); (3) *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239 (2d Cir. 2014). But none of these cases is analogous to the incident that happened aboard the Rintoul.

*Gruver*, for example, was involved in the physical assault of a crewman aboard a shrimp and crab boat in the morning hours before the fishing vessel he was on set sail for the day. 489 F.3d at 980–81. Here, the Ninth Circuit contended that "resolving a disagreement with a crewmember through physical violence could render the crewmember unable to perform his fishing duties." *Id.* at 983. But the Rintoul is not a commercial fishing vessel; it is a private sailing yacht. *See* ECF No. 10 at PageID.38. So, while it may be conceivable that an assault upon a

- 10 -

fisherman could render a fishing vessel undermanned and ill-prepared for a commercial fishing voyage—which surely impacts maritime commerce—the same cannot be said for an assault occurring on a private sailing yacht.

*Russo* is involved in the alleged sexual battery of the Chief Chef aboard a cargo vessel. No. 2:14-CV-03184-ODW, 2014 WL 3506009, at *1. Here, the court relied on the reasoning from *Gruver*, arguing that actions that have a direct impact on a crewmember's health, life, and ability to perform their duties have a sufficient potential impact on maritime commerce. *Id.* at *3 (citing *Gruver*, 489 F.3d at 982–83). But, like *Gruver*, *Russo* involved a commercial ship—namely, a cargo vessel. *See id.* at *1. So *Russo* is distinguishable from the incident aboard the Rintoul in the exact same way as *Gruver*.

Finally, *Tandon* involved a fist fight between two groups of boaters on a dock, where one combatant was knocked into the water and allegedly held under the water to the point of asphyxia. 752 F.3d at 242. Notably, the Second Circuit held that this situation did not pose a threat to maritime commerce. *Id.* at 249. Still, Plaintiff cites *Tandon* for the proposition that "assault on a vessel may distract the crew from their duties, endangering the safety of the vessel and risking collision with others on the same waterway; they may also necessitate diverting for medical care." ECF No. 30 at PageID.251. But while the *Tandon* court did assert this reasoning, 752 F.3d at 250, Plaintiff omits the fact that the *Tandon* court was discussing a *moving* vessel, not a boat docked like the Rintoul.  *See id.* ("This type of incident does not pose the same risks to maritime commerce as a fistfight occurring *on a vessel on navigable water*" and "If a fight injures someone on a *vessel that is at sea*, moreover, that vessel may be forced to divert from its course to obtain medical care for the injured person.") (emphasis added).

In summary, while assaults aboard commercial vessels—like *Gruver* and *Russo*—may impact maritime commerce, assaults on non-commercial vessels—like the Rintoul—do not. And, while an assault aboard a moving vessel may impact a victim's ability to perform their duty, erode captain-crewmember trust, or even force diversion due to medical necessity—thus, impacting maritime commerce—that same concern is not present when a vessel is docked, as the Rintoul was. So, this line of reasoning, too, does not establish a potential effect on maritime commerce.

Lastly, Plaintiff offers one final argument that assaults against crewmembers could require emergency evacuation from a vessel. ECF No. 30 at PageID.252. The identified fear is that an evacuation would involve nearby vessels and could include Coast Guard or other maritime law enforcement vessels, potentially ensnaring or diverting commercial vessels in the surrounding area. *Id.* For this proposition, Plaintiff cites *Ayers v. United States*, 277 F.3d 821 (6th Cir. 2002). *Ayers* involved the drowning of a man caused by the sudden turbulence of the opening of a lock[4] on the Kentucky River. 277 F.3d at 824. *Ayers* held that, barring immediate recovery of the deceased, "a drowning requires vessels to engage in some rescue and recovery effort, and if such an effort were to occur immediately downstream from a lock, then some not-insignificant interruption of commercial activity might result." *Ayers*, 277 F.3d at 827. But while a search and rescue operation immediately downstream from a busy river lock is sure to impact the passage of commercial vessels, that is not so with a sexual assault aboard a docked sailing yacht. Indeed, it is hard to imagine how an assault aboard a docked vessel could impede waterways or divert ships.

---

[4] Locks change the elevation of the water level between different locations. A lock is a stretch of water that is blocked off at each end by solid gates. These gates are opened or closed to allow water to fill or drain from the lock. *How does a canal lock work?,* CANALRIVERTRUST.ORG, (last visited Jan. 15, 2026), https://canalrivertrust.org.uk/canals-and-rivers/how-does-a-canal-lock-work?utm_.

At bottom, none of Plaintiff's arguments are sufficient to plead a potential impact on maritime commerce. And both parts of the connection test are necessary for maritime jurisdiction to be proper under 28 U.S.C. § 1333(1), *Tandon*, 752 F.3d 248, so this Court need not analyze whether Plaintiff has pleaded facts sufficient to establish a maritime tort. Therefore, Plaintiff has not met his burden of proving subject matter jurisdiction. *See Moir*, 895 F.2d at 269 ("Where subject matter jurisdiction is challenged pursuant to Rule 12(b)(1), the plaintiff has the burden of proving jurisdiction in order to survive the motion."). And Defendants' Motion to Dismiss the claims against the Rintoul for lack of subject matter jurisdiction will be granted. ECF No. 27. So, the Rintoul will be dismissed as a Defendant.

### III.

### A.

Move to Defendant's Motion to Amend. Leave to amend a pleading may be had as a matter of course within 21 days of filing the complaint, or 21 days after service of a responsive pleading is served, if one is required, or 21 days of service of motions under Rule 12(b), (e), or (f). FED.R.CIV.P. 15(a)(1). After this period expires, leave to amend the pleadings may be granted by the Court; the Court should grant such leave freely "when justice so requires." FED.R.CIV.P. 15(a)(2). But a motion to amend should be denied in the presence of (1) bad faith, undue delay, or dilatory tactics; (2) lack of notice to the opposing party; (3) a repeated failure on behalf of the movant to cure deficiencies by previous amendments; (4) undue prejudice to the nonmovant; or (5) futility. *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 640–41 (6th Cir. 2018) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)); Colvin v. Caruso, 605 F.3d 282, 294 (6th Cir. 2010). "The decision to grant or deny leave to amend is 'left to the sound discretion of the trial judge.'" *Halasz on behalf of H.H. v. Cass City Pub. Sch.*, 748 F. Supp. 3d 482, 491 (E.D. Mich. 2024) (quoting *Robinson v. Michigan Consol. Gas Co. Inc.*, 918 F.2d 579, 591 (6th Cir. 1990)).

**B.**

In their Motion to Amend, Defendants seek to amend (1) allegations in their Answer, (2) their Affirmative Defenses, and (3) authorization to file a tardy notice of non-party at fault. ECF No. 24. at PageID.121. Each will be addressed in turn.

First, would be Defendants' arguments to amend their Answer. Defendants assert that some circuits have allowed Defendants to abandon an admission of fact based on inadvertence. ECF No. 24 at PageID.124 (citing *Watson v. Schwarzenegger*, 347 F. App'x 282, 285 (9th Cir.2009) (holding that the district court did not abuse its discretion in allowing the defendants to amend their answer because the defendants' inadvertent admission was due to a clerical error). Courts within our Circuit have said that inadvertence may be evidenced by "contradictory admissions and denials in the answer that the defendant later seeks to harmonize through an amendment or through later discovery of conflicting evidence." *DAGS II, LLC v. Huntington Nat. Bank, N.A.*, No. 1:13-CV-393, 2013 WL 6884242, at *4 (W.D. Mich. Dec. 31, 2013), *vacated and remanded sub nom DAGS II, LLC v. Huntington Nat. Bank*, 616 F. App'x 830 (6th Cir. 2015). But Defendants are not seeking to simply harmonize conflicting admissions and denials. Indeed, Defendants are attempting to completely rework their pleadings. Plaintiff's counsel has provided a chart—and this Court has evaluated its accuracy—of summaries of the proposed changes Defendants seek to make to their admissions and denials:

| Original Answer: | Proposed Amended Answer: |
|---|---|
| Par 1: Carter admits that Keoleian was a voluntary crew member on the referenced vessel for the 100th Bayview Mackinac Race. | Par 1: Defendants deny that the alleged assault occurred while Plaintiff was serving as a crewmember aboard the Margaret Rintoul, IV, captained by Carter. |
| Par 3: Carter admits that diversity of citizenship exists. | Par 3: Defendants neither admit nor deny diversity of citizenship exists. |
| Par 4: Defendant admits Plaintiff is a citizen of New York. | Par 4: Defendants neither admit nor deny Plaintiff is a citizen of New York. |

- 14 -

| | |
|---|---|
| Par 5: Defendants admit Carter was at all times material to issues herein, the captain of the Margaret Rintoul IV | Par 5: Defendants neither admit nor deny Carter was the captain of the vessel at all times material to issues herein. |
| Par 6: Defendants admit The MARGARET RINTOUL IV competed in the 100th Bayview Mackinac Race commencing on July 20, 2024 in Port Huron, MI, that the race is the world's oldest continuously run long distance freshwater yacht race, attracting competitors from all over the world, and bringing in tens of millions of dollars in economic benefit to the State of Michigan and that 2024's race had approximately 335 vessel entrants. Defendant further affirmatively stated: "Carter further states that at the end of the subject race Mackinac Island Harbor is taken over by the 335 vessels, their crews and their families and friends which result in a raucous, chaotic, and alcohol fueled festival type atmosphere with the island being overrun by thousands of race fans and fellow party goers." | Par 6: Admits only that the Margaret Rintoul IV competed in the race that started on July 20, 2024, neither admits nor denies the rest, and omits the affirmative statement concerning the post-race environment. |
| Par 7: Defendant affirmatively stated: "Keoleian had sailed this race in prior years on the same boat and was familiar with Carter and the nature of his personality. Further, the context of the race over the course of three days forces a degree of intimacy and connection between and among the entire crew whereby everybody gets to know Carter. In fact, Keoleian was so familiar with Carter that he showed up for the race with a carton of Carter's brand of cigarettes, a case of Carter's favorite beer and a bottle of liquor from which Keoleian poured shots for himself and Carter on the boat before and after the finish of the race." | Par 7: Completely omits these previous statements. |
| Par 8: Carter affirmatively stated that "he and Keoleian began drinking and doing shots on the vessel well before 9:51 am. The boat docked in at its preassigned slip at the end of the dock which forced the crew to walk a significant distance to the shore passing hundreds of boats and crowds of people. At the time that vessel docked, Keoleian was | Par 8: Completely omits these previous statements |

- 15 -

| focused on partying and getting drunk and was unwilling to assist the first mate in docking the vessel or 'cleaning it up.' Carter lacks knowledge or information to form a belief about the truth of the allegation as to how Keoleian spent his time after the race. Carter did not have dinner with Keoleian. Keoleian went to dinner with others from the boat at The Gate House restaurant where one party was so drunk that he vomited at the table as the crew 'socialized.' Carter is without knowledge about what time Keoleian returned to the boat or where Carter was at that time." | |
|---|---|

ECF No. 25 at PageID.162–64.

Importantly, much of the information pleaded in Defendants' original Answer for paragraphs 6, 7, and 8 was *added* by the Defendants themselves. *See* ECF No. 13 at PageID.66. These statements are judicial admissions. "Judicial admissions are 'formal admissions in the pleadings which have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of that fact.' " *Brown v. Bassett Used Cars LLC*, No. 22-11106, 686F.Supp.3d 589, 594 (E.D. Mich. Aug. 8, 2023) (quoting *In re Kattouah*, 452 B.R.604, 608 (E.D. Mich. 2011)). For a statement to be a judicial admission, it must be "deliberate, clear, and unambiguous," and must "amount to an express concession of a fact." *In re Kattouah*, 452 B.R. 604, 608 (E.D. Mich. 2011). Defendants' statements from the pleadings were deliberate, clear, and unambiguous. Importantly, Defendants have not explained how their proposed changes to their already pleaded Answer would harmonize conflicting admissions. *See generally* ECF No. 24. So, the Court will deny Defendants' Motion to Amend insofar as Defendants seek to amend their Answer.

Defendants also seek to add several affirmative defenses. Defendants contend that their proposed amendments are based on further research into the issues of the case. ECF No. 24 at PageID.120. Defendants argue that further research indicates that the case is governed by Michigan

law, not maritime law. *Id.* And the Court has concluded that Plaintiff cannot establish the predicate for the exercise of maritime law. *See supra* at II.B.2.

But a "[f]ailure to plead an affirmative defense in the first responsive pleading to a complaint generally results in a waiver of that defense." *Horton v. Potter*, 369 F.3d 906, 911 (6th Cir. 2004) (citing *Haskell v. Washington Twp.*, 864 F.2d 1266, 1273 (6th Cir. 1988)). However, the "failure to raise an affirmative defense by responsive pleading does not always result in waiver of the defense," such as where the plaintiff has received notice of the affirmative defense by some other means or where amendment is permitted under Rule 15(a). *Seals v. Gen. Motors Corp.*, 546 F.3d 766, 770 (6th Cir.2008) (citing FED. R. CIV. P. 15(a)). And the Sixth Circuit has explicitly held that Rule 15(a) "allows a party to amend his pleading to assert an omitted affirmative defense." *Phelps v. McClellan*, 30 F.3d 658, 663 (6th Cir. 1994).

Rule 15(a) provides that after a responsive pleading is filed, a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires. FED. R. CIV. P. 15(a). And a motion to amend should only be denied in the presence of (1) bad faith, undue delay, or dilatory tactics; (2) lack of notice to the opposing party; (3) a repeated failure on behalf of the movant to cure deficiencies by previous amendments; (4) undue prejudice to the nonmovant; or (5) futility. *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 640–41 (6th Cir. 2018) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

Plaintiff argues that Defendants' Motion to Amend their affirmative defenses is made in bad faith. ECF No. 25 at PageID.165. In particular, Plaintiff argues that several admissions were made as part of Defendants' Affirmative Defenses during the initial pleadings which are absent from the proposed Amended Affirmative Defenses. *Id.* Plaintiff is correct. Defendants notably assert several of the same affirmative defenses, just without admissions. *Contrast* ECF No. 24-4

- 17 -

at PageID.153–55, *with* ECF No. 13 at PageID.70–73. Seemingly, the only new affirmative defenses that Defendants cite are found in paragraphs 2, 3, 4, 10, 11, and 15 of the proposed Amended Affirmative Defenses. *See* ECF No. 24-4 at PageID.153–55.

Therefore, Defendants will be allowed to amend their Affirmative Defenses to add the new defenses in paragraphs 2 (no genuine issue as to any material fact, ECF No. 24-4 at PageID.153), 3 (statutes of limitations, *id.* at PageID.154), 4 (lack of maritime jurisdiction, *id.*), 10 ("Plaintiff has not been damaged," *id.* at PageID.155), 11 (Plaintiff's damages are because of a pre-existing condition, *id.*), and 15 (Plaintiff's damages are not recoverable under applicable law, *id.*) of their proposed Amended Affirmative Defenses. But Defendants will not be allowed to abandon the admissions they have already made by changing the language in their existing Affirmative Defenses.[5]

Lastly, Defendant seeks leave to file a notice of non-party at fault. *See* ECF No. 24 at PageID.114. Defendants argue that the unnamed, transexual prostitute is a necessary party. *Id.* at PageID.128. And without the prostitute, Defendants assert that there would be no way to obtain complete relief among the existing Parties. *Id.* Notably, in 1995, the Michigan Legislature abolished joint and several liability among tortfeasors in actions involving—among other things— personal injury, involving the fault of more than one person. *See* MICH. COMP. LAWS § 600.2956 ("Except as provided in section 6304, in an action based on tort or another legal theory seeking damages for personal injury, property damage, or wrongful death, the liability of each defendant

---

[5] Plaintiff also argues that allowing Defendants to amend their Affirmative Defenses will result in undue delay and prejudice, in part, because those new affirmative defenses will require additional discovery. *See* ECF No. 25 at PageID.166. But the Parties stipulated to an adjournment of the Scheduling Order; and, the Court granted that Stipulation, ECF No. 40 which extended the discovery deadline to May 14, 2026. Therefore, Plaintiff is not prejudiced by undue delay for lack of time in discovery.

for damages is several only and is not joint."); *Smiley v. Corrigan*, 638 N.W.2d 151 (Mich. Ct. App. 2001) (noting that § 600.2956 abolished joint and several liability and replaced it with "fair share liability"). Instead, § 600.2957 provides the new rule:

> In an action based on tort or another legal theory seeking damages for personal injury, property damage, or wrongful death, the liability of each person shall be allocated under this section by the trier of fact and, subject to section 6304, in direct proportion to the person's percentage of fault.

*Id.*

And MICH. COMP. LAWS § 600.2957 provides for the amendment of a complaint after a non-party who may have been at fault is identified:

> 2) Upon motion of a party within 91 days after identification of a nonparty, the court shall grant leave to the moving party to file and serve an amended pleading alleging 1 or more causes of action against that nonparty. A cause of action added under this subsection is not barred by a period of limitation unless the cause of action would have been barred by a period of limitation at the time of the filing of the original action.

*Id.* at § 600.2957(2).

MCR 2.112(K)(3) provides for how a Defendant must provide notice to an opposing party that a non-party is wholly or partially at fault:

> (3)Notice.
>
> > (a) *A party against whom a claim is asserted may give notice of a claim that a nonparty is wholly or partially at fault.* A notice filed by one party identifying a particular nonparty serves as notice by all parties as to that nonparty.
> >
> > (b) The notice shall designate the nonparty and set forth the nonparty's name and last known address, or the best identification of the nonparty that is possible, together with a brief statement of the basis for believing the nonparty is at fault.
> >
> > (c) *The notice must be filed within 91 days after the party files its first responsive pleading. On motion, the court shall allow a later filing of the notice on a showing that the facts on which the notice is based were not and could not with reasonable diligence have been known to the moving party*

*earlier,* provided that the late filing of the notice does not result in unfair prejudice to the opposing party.

*Id.* Notably, parties are only allowed to file the notice within ninety-one days of their first responsive pleading, and a later filing can only be accomplished by a motion and only then "when the facts on which the notice is based were not and could not with reasonable diligence have been known to the moving party earlier." *Id.* at MCR 2.112(K)(3)(c).

And Defendants filed their Motion to Amend on August 29, 2025, ECF No. 24—five months after they filed their Answer to Plaintiff's Amended Complaint on March 21, 2025, ECF No. 13. And Defendant's had notice of the potential non-party, the prostitute, since the initial filings of this case when Plaintiff referred to her in both the initial and Amended Complaint. *See* ECF No. at PageID.3; ECF No.10 at PageID.39. Clearly, Defendants' Notice is untimely.

But there is one issue. Under *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938), a federal court sitting in diversity must apply state substantive law and federal procedural law. *First Bank of Marietta v. Hartford Underwriters Insurance Co.*, 307 F.3d 501, 528 (6th Cir.2002). And this Court is now sitting in diversity jurisdiction, having dismissed the maritime law claims, and is relieved of *in rem* jurisdiction over the Rintoul. *See supra*, II.B.2. As a result, Plaintiff's remaining claims all arise under state law. ECF No.10 at PageID.40–45.

But "the *Erie* doctrine is intended to discourage forum shopping and avoid the inequitable administration of justice, and to prevent the 'character or result of a litigation materially to differ because the suit had been brought in a federal court.'" *Greenwich Ins. Co. v. Hogan*, 351 F. Supp. 2d 736, 739 (W.D. Mich. 2004) (quoting *Hanna v. Plumer*, 380 U.S. 460, 467–68 (1965)). Courts within this District have held that MCR 2.112(K)'s notice provision is "part and parcel of Michigan's substantive tort law," and not following it "would result in tort litigation differing

materially depending on whether a suit was brought in state court or as a diversity action in federal court." *Greenwich*, 351 F. Supp. 2d 736 at 739; *see also Smith v. Norfolk S. Co.*, No. 14-CV-10426, 2014 WL 2615278, at *2 (E.D. Mich. June 12, 2014); *American Ins. Co. v. Dornbracht Americas, Inc.*, 2013 WL 1788573 at *2 (E.D. Mich. Apr.26, 2013). Thus, viewing MCR 2.112(K) as a purely procedural matter would "promote the very forum shopping and inequitable administration of the laws Erie sought to avoid." *Greenwich*, 351 F. Supp. 2d 736 at 739. So, this Court, like other courts within this District, will apply the ninety-one-day procedural bar from MCR 2.112(K) and prevent Defendants from filing their notice of non-party at fault.

Defendants counter that Plaintiff received notice of non-party at fault by other means, namely that Defendants notified Plaintiff in both February and March of 2025. ECF No. 24 at PageID.128. The "notice" Defendants provided in February was a paragraph within a motion to dismiss—which this Court mooted after Plaintiff filed an Amended Complaint, ECF No. 10— which argued that "[d]ismissal is warranted under Fed. R. Civ. P. 12(b)(7) because the plaintiff has failed to name and join the "transsexual prostitute." ECF No. 7 at PageID.33. The March "notice" comes from an affirmative defense that Plaintiff failed to join a required party under FED. R. CIV. P. 19(a)(1)(A) in Defendants' Answer to Plaintiff's Amended Complaint. ECF No. 13 at PageID.71.

But for notice to be sufficient under MCR 2.112(K)(3), a party needs to have "filed" the notice with the Court. MCR 2.112(K)(3)(a). And MCR 2.112(K)(3)(b) provides what that notice needs to "designate the nonparty and set forth the nonparty's name and last known address, or the best identification of the nonparty that is possible, together with a brief statement of the basis for believing the nonparty is at fault." No such notice was filed with the Court. And Michigan appellate courts have held that, although the court rule does not require that the party providing notice give

it in a separate document referring to it as "a notice," the "[Michigan] Supreme Court [has] indicated that the requirements of that rule must be met by a notice that is filed under the rule— that is, the filing must be identified as one purporting to give notice that the defendant is asserting his or her right to have the finder of fact allocate fault to a third party *under the court rule.*" *Taylor v. Michigan Petroleum Techs., Inc.*, 859 N.W.2d 715, 722 (Mich. 2014) (citing MCR 2.112(K)(3)). Thus, any other forms of notice that the Plaintiff may have received are inadequate under MCR 2.112(K)(3), and Defendants are not permitted to file a Notice of Non-Party at Fault.

At bottom, Defendants' Motion to Amend is denied in part (1) insofar as they seek to amend their answer, (2) insofar as they seek to modify their existing affirmative defenses, and (3) insofar as they seek to file a Notice of Non-Party at Fault. Defendants' Motion to Amend is granted in part insofar as Defendants seek to add the additional affirmative defenses found in paragraphs 2, 3, 4, 10, 11, and 15 of their proposed Amended Affirmative Defenses.

## IV.

Accordingly, it is **ORDERED** that Defendants' Motion to Dismiss, ECF No. 27, is **GRANTED**.

Further, it is **ORDERED** that Count VI, the Maritime Tort Lien against the Margaret Rintoul IV, ECF No. 10 at PageID.46, is **DISMISSED.**

Further, it is **ORDERED** that the Margaret Rintoul IV is **DISMISSED** as a Defendant.

Further, it is **ORDERED** that Defendant's Motion to Amend, ECF No. 24, is **DENIED** insofar as (1) he seeks to amend his Answer, (2) insofar as he seeks to modify his existing Affirmative Defenses, and (3) insofar as he seeks to file a notice of non-party at fault.

Further, it is **ORDERED** that Defendant's Motion to Amend, ECF No. 24, is **GRANTED** insofar as Defendants seek to add the additional affirmative defenses found in paragraphs 2, 3, 4, 10, 11, and 15 of his proposed Amended Affirmative Defenses.

Finaly, it is ORDERED that the Case Management and Scheduling Order, ECF No. 18, and the amended stipulations to adjourn the Scheduling Orders, ECF Nos. 34; 40, are **ADJOURNED** as follows:

| | |
|---|---|
| Expert Disclosures, Plaintiff Served By: | March 12, 2026 |
| Expert Disclosures, Defendant Served By: | April 9, 2026 |
| Discovery Cutoff: | May 14, 2026 |
| Settlement Conference: | May 20, 2026, at 3:00 PM |
| Motions Challenging Experts Due: | May 29, 2026 |
| Dispositive Motions Due: | June 11, 2026 |
| Rule 26(a)(3)(B) Disclosures Due: | September 17, 2026 |
| Motions *in limine* Due: | September 24, 2026 |
| Pretrial Submissions Due: | October 22, 2026 |
| Final Pretrial Conference: | November 3, 2026 at 3:00 PM |
| Jury Trial: | November 17, 2026 at 8:30 AM EDT |

**This is not a final order and does not close this case.**

Dated: February 12, 2026

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge